# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA,**     :

:        **CRIMINAL NO. 3:23-cr-84**

**v.**                    :              **(JUDGE MANNION)**

**JESSIE MCGRATH,**            :

**Defendant.**       :

## MEMORANDUM

Before the court are Defendant Jessie McGrath's motion to dismiss for lack of jurisdiction, (Doc. 6), and motion to suppress evidence, (Doc. 8). After fleeing officers who attempted to pull him over for speeding in the Delaware Water Gap National Recreation Area, McGrath was apprehended at his home in Pike County, Pennsylvania. Upon arrest, McGrath admitted that he had been driving without a valid license and submitted to a breath test which indicated alcohol use. The Government has charged Mr. McGrath in five counts: (1) fleeing or attempting to elude a police officer, a Pennsylvania offense charged pursuant to the federal Assimilative Crimes Act, (2 & 3) operating a vehicle under the influence of alcohol, (4) reckless driving, and (5) driving while operating privilege is revoked. (Doc. 1).

McGrath has moved to dismiss Count 1 of the Information, arguing that it fails to state an offense because the court lacks jurisdiction over this

charge. (Docs. 6, 7). McGrath has also moved to suppress all evidence obtained from the government's "search" of his home and his arrest, arguing that these amounted to an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution. (Docs. 8 & 10).

McGrath filed a brief in support of each motion, (Docs. 7 & 10). The government filed briefs in opposition to each motion, (Docs. 15 & 16). McGrath filed reply briefs. (Docs. 19 & 20). The court then ordered supplemental briefing, and the parties accordingly submitted their supplemental briefs. (Docs. 22 & 23).

## I. BACKGROUND[1]

At approximately 11:13p.m. on February 9, 2023, officers Cook and McNair, patrolling the Delaware Water Gap National Recreation Area, observed a vehicle traveling at a high rate of speed. The radar device on the patrol unit registered the vehicle traveling 58 miles per hour in a 35 miles per hour zone.

The patrolling officers activated their emergency lights and siren and began following the car. It did not stop. Instead, after briefly slowing down

---

[1] The following information is derived from Officer L. McNair's Incident Report, (Doc. 9-2), and Statement of Probable Cause, (Doc. 9-3), and police body camera recordings (Doc. 9-1, Exhibits A–G).

and pulling into the shoulder, the car accelerated. It continued to flee by passing other vehicles, crossing into the opposite lane to do so. The patrol vehicle accelerated to approximately 75 miles per hour but was still outpaced by the fleeing car. The officers lost contact with the car as it continued to accelerate.

The officers elected to halt the high-speed chase for public safety as well as officer safety. They convened with Officers Roessner and Seyfried off the side of the road. Having recorded the car's license plate number, the officers determined the registered owner's address, and because it was nearby, they went there. About 15 minutes passed between the end of the chase and the officers' arrival at McGrath's residence.

The officers found McGrath's car parked outside the house and observed that the hood was still warm. They approached the house after determining there was no one along the property's exterior. Supervising Officer Todd Roessner approached the front door of the home. At 11:34p.m., officers knocked on McGrath's front door.

After the initial knock, the officers approached the windows several feet to the right and left of the front door, using flashlights to look inside. They observed Mr. McGrath inside the house and heard his mother tell him to answer the door. The officers continued knocking, and called out: "Open the

door, police." McGrath's mother answered the door at 11:35p.m. Officer Roessner explained that they were looking to speak with the driver of a car that had fled from them. Mrs. McGrath responded, "alright, hold on," and went back inside.

Officer Roessner again called inside: "Tell him to come out or it's gonna get worse." Officer Seyfreid observed through the window that McGrath was in a back room and that he closed the room's door. The officers continued knocking and looking in the windows. They could then hear the McGraths "yelling at each other"—her telling him to come out and him saying that he would not.

At approximately 11:38, Officer Roessner called the following: "Police, come on out." "We're gonna come in if he doesn't come out, it's gonna be worse." He further instructed Mrs. McGrath, who was still inside, to put the dog away, because "we're gonna come in and get [McGrath]." The officers were visibly armed, and at approximately 11:39 drew their weapons. McGrath again called: "If we have to come in and the dog's not tied up, the dog's gonna get hurt." "Come on out, we can talk about this." "You need to come out, we're not going anywhere."   At approximately 11:39, McGrath exited the home. Officers did not enter the home to apprehend him.

- 4 -

Once McGrath exited his home, he was immediately arrested and advised of his <u>Miranda</u> rights. McGrath then agreed to speak to the officers. He acknowledged fleeing and that he had been drinking that night. Officers performed a sobriety test and observed signs of impairment. A portable breath test was also administered and alerted to the presence of alcohol.

After McGrath was transported back to the police station, a blood alcohol test was performed. McGrath had a blood alcohol content ("BAC") of .159%. Due to McGrath's prior DUI history, his license had been revoked at the time of this incident.

## II. MOTION TO DISMISS

Mr. McGrath moves to dismiss Count 1 of the Information for failure to state an offense and lack of jurisdiction. Pursuant to the Assimilative Crimes Act ("ACA") (18 U.S.C. §13(a)), the government charges McGrath with a violation of 75 Pa. Cons. Stat. §3733: "Fleeing or attempting to elude police officer."

The ACA fills gaps in criminal law on federal land by making applicable state-law crimes with no federal counterpart. <u>Lewis v. U.S.</u>, 523 U.S. 155 (1998). More specifically, it subjects a defendant's acts or omissions on federal land to state criminal laws that are "not made punishable by any

enactment of Congress." 18 U.S.C. §13; <u>Lewis</u>, 523 U.S. at 159. Even where a defendant's act *is* made punishable by an enactment of Congress, the state law may still be applied so long as the federal law does not preclude it. <u>Lewis v. U.S.</u>, 523 U.S. 155, 164. McGrath asserts that his alleged conduct is appropriately punished by 36 C.F.R. §4.2, under which imprisonment is limited to six months, not by the Pennsylvania statute charged in Count 1.

### a. Assimilative Crimes Act

The ACA provides:

> Whoever [on federal land] … is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State … in which such place is situated, by the laws thereof in force at the time … shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. §13(a).

The Supreme Court has established a two-part inquiry for determining the scope of ACA assimilation. <u>Lewis v. United States</u>, 523 U.S. 155, 164 (1998). First, a court must ask, (1) "Is the defendant's 'act or omission … made punishable by *any* enactment of Congress.'" <u>Id.</u> at 164 (omission in original). If not, the "ACA presumably would assimilate the statute." <u>Id.</u> If it is, the court then asks (2) "whether the federal statutes that apply to the 'act or omission' preclude application of the state law in question." <u>Id.</u> Federal law may preclude state law where, for example, "its application would interfere

with the achievement of a federal policy," where "the state law would effectively rewrite an offense definition that Congress carefully considered," or where federal law "reveal[s] an intent to occupy so much of a field as would exclude use of the particular state statute." Id. at 164–65.

### b. Criminal offenses at issue

A federal regulation is an "enactment of Congress" for ACA purposes. United States v. Hall, 979 F.2d 320 (3d Cir. 1992). Title 36 C.F.R. §4.2 provides:

> (a)  Unless specifically addressed by regulations in this chapter, traffic and the use of vehicles within a park area are governed by State law. State law that is now or may later be in effect is adopted and made a part of the regulations in this part.
> (b)  Violating a provision of State law is prohibited.

Title 75 of the Pennsylvania Consolidated Statutes, §3733(a), penalizes "[a]ny driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer." This offense constitutes a felony if the driver was under the influence of alcohol or a controlled substance, crossed a state line, or "endanger[ed] a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase." §3733(a.2)(2). The government charges McGrath with a felony offense under this provision.

c. Analysis

Mr. McGrath contends that Count I should be dismissed because 36 C.F.R. §4.2 "uniformly penalizes all state traffic/vehicle violations that occur in park areas." (Doc. 7, at 1). Because §4.2 punishes violations of state law concerning "traffic and the use of vehicles," and §3733 concerns "traffic and the use of vehicles," McGrath observes, any conduct prohibited by §3733 is also prohibited by §4.2. He further posits that "[r]egulators intended to bring the violation of this type of law within the broad reach and coverage of 36 C.F.R. §4.2" (Doc. 7, at 5).

But the ACA's scope is narrower. <u>Lewis</u> concluded that Congress did not intend the phrase "any enactment" "to carry an absolutely literal meaning." 532 U.S. at 161.

> A literal interpretation of the words 'any enactment' would leave federal criminal enclave law subject to gaps of the very kind the Act was designed to fill. The Act would be unable to assimilate even a highly specific state law aimed directly at a serious, narrowly defined evil, if the language of *any* federal statute, however broad and however clearly aimed at a different kind of harm, were to cover the defendant's act.

> <u>Id.</u>

Section 4.2 is a "catch-all provision," pertaining to "traffic and rules of the road." <u>United States v. Fox</u>, 60 F.3d 181, 185 (4th Cir. 1995). The narrower §3733, by contrast, is directed specifically at more serious

offenses. Fleeing from the police by car, not to mention doing so at high speeds or while intoxicated, is no mere traffic offense. Such conduct involves an utter disregard for public safety and for law enforcement. Section 3733 is the type of "highly specific state law aimed at a serious, narrowly defined evil" which Congress intended to assimilate. Lewis, 523 U.S. at 161.

Other district courts have similarly reasoned. United States v. Hope, No. 3:09-CR-00039-1, 2010 WL 2405354, *1 (W.D. Va June 10, 2010), aff'd 408 F.App'x 695 (4th Cir. 2011), analyzed a provision of Virginia law similar to the Pennsylvania statute charged here.[2] Rejecting the defendant's argument that 36 C.F.R. §4.2 covered his offense, the court concluded that "the precise act prohibited by Virginia's eluding statute is not specifically prohibited by federal law." Id. at *2. It explained that "[t]he crime of eluding … is the defiance of an order by the police to stop … and the resulting interference with or endangerment of the operation of the law enforcement vehicle or endangerment of a person." Id. at *2. While the proscribed conduct, as in §4.2, requires the use of a motor vehicle, "the gravamen of

---

[2] Title 46.2 Virginia Code §46.2-817 makes guilty of a felony offense "[a]ny person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person."

the offense is disobeying an order to stop, combined with interference or endangerment." Id.

More recently, an identical argument was rejected in this district. United States v. Baker, 2023 WL 4707399 (M.D. Pa. 2023). The defendant in Baker, having been indicted under 75 Pa. Cons. Stat. §3733, moved to dismiss, similarly relying on 36 C.F.R. §4.2. The court concluded that the charged portions of §3733 (the felony offense of fleeing while endangering officers and the public) "go well beyond the rules of traffic and the use of vehicles encompassed within §4.2." Id. at *3. It therefore found that the defendant's acts "were not made punishable by Section 4.2 or any other enactment of Congress, and that the ACA is properly used to assimilate 75 Pa. Cons. Stat. §3733." Id.

The court concludes that the answer to Lewis's first question is "no": Defendant McGrath's acts or omission is not made punishable by any enactment of Congress. 523 U.S. at 164. So the ACA is properly used to assimilate the state statute, and Defendant's motion to dismiss for lack of jurisdiction must be denied.

## II.   MOTION TO SUPPRESS

### a.  Legal Standard

Protection against unreasonable searches and seizures is provided by the Fourth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

> U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753–55, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause."

Carpenter v. United States, 138 S.Ct. 2206, 2213 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998).

"Under the exclusionary rule, 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" Id. "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" Id. (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was

reasonable." Id. (citation omitted). That is, the government must show that the warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011).

### b. Was Defendant McGrath subject to a search?

McGrath argues that the officers effected an unreasonable search when they entered his porch, shone flashlights through his windows, and peered into his home. (Doc. 10, at 7).

"[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6 (2013). And a home's curtilage, or "the area immediately surrounding and associated with the home," is regarded as "part of the home itself for Fourth Amendment purposes." Id. The front porch is constitutionally protected as part of the curtilage. Id. at 7.

When conducted in a constitutionally protected area, police investigation amounts to a search if it was "accomplished through an unlicensed physical intrusion." Id. Jardines recognized that an "implicit license" exists at the home, typically permitting "the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 8. In Jardines, the introduction of a drug-sniffing dog to examine the outside of a home exceeded this implicit license. Id. at 9.

McGrath argues that the officers' conduct here likewise exceeded this implicit license. (Doc. 10, at 7). Peering into a home's interior, he contends, is "inconsistent with prevailing social norms." (Doc. 23, at 3).

The government starts with the propositions that lawfully positioned officers may observe what is displayed for the public, and that they may enter parts of private property otherwise open to visitors and look through windows.[3] (Doc. 22, at 2). It also notes the principle that the use of flashlights to illuminate an otherwise plain view does not constitute a search. See Texas v. Brown, 460 U.S. 730, 740 (1983).

The propositions offered by the government regarding officers' permissible conduct while in lawful positions are not entirely apposite, for the officers here were in a protected area: the front porch. While, consistent with the implied license discussed above, the path to the front door is open to visitors, the area surrounding windows several feet to the door's side typically is not. And although the use of a flashlight does not itself turn a plain view

---

[3] "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. U.S., 389 U.S. 347, 351. (1967) "If an officer is lawfully positioned in a place from which an object can be plainly viewed, the officer is permitted to notice whatever is put on display." U.S. v. Gordon, 741 F.3d 64, 71 (10th Cir. 2014) (citing Horton v. California, 496 U.S. 128, 134 (1990)). "[W]hen they are legally in a place they may be, [the police] may look through windows and doors and other openings into homes and other places protected by the Fourth Amendment." U.S. v. Contreras, 820 F.3d 255, 261 (7th Cir. 2016).

observation into an unconstitutional search, it is not irrelevant in assessing police conduct. See, e.g., United States v. Duncan, 2020 WL 5801079, at *5 (E.D. Ky. 2020) ("Finally, [officers] also unconstitutionally searched the apartment by looking through the apartment's window, which formed part of the home's curtilage …. [the officers] peered through the small space between the blinds and the window, even using a flashlight to shine light into the space. In doing so without a warrant, the officers conducted an unconstitutional search of the apartment's curtilage."). Unlike Brown, which involved an automobile on a public road, this case involves the use of a flashlight to illuminate the inside of a home.

The government characterizes Jardines's holding as narrowly pertaining to the use of trained narcotics dogs, and its instructions regarding the implicit license to enter a home as dicta.[4] (Doc. 22, at 5). Because the

---

[4] Dictum is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." In re McDonald, 205 F.3d 606, 612 (3d Cir. 2000). In analyzing whether the use of a trained narcotics dog on a defendant's porch was unconstitutional, the Court explained that "the question before the court [was] precisely *whether* the officer's conduct was an objectively reasonable search." Jardines, 569 U.S. at 10. That determination depended on "whether the officers had an implied license to enter the porch, which in turn depend[ed] upon the purpose for which they entered." Id. The Court reasoned that the police's conduct exceeded the implicit license described above, and so held that it constituted a Fourth

*(footnote continued on next page)*

officers' conduct in conducting a "knock and talk," the government argues, was objectively reasonable under the circumstances, it was constitutional. (Id.).

Whether the officers' conduct was objectively reasonable "depends on whether they had an implied license to enter the porch, which in turn depends on the purpose for which they entered." Jardines, 569 U.S. at 10. According to the government, the officers' purpose was no more than a "knock and talk." A warrantless "knock and talk" is indeed an accepted practice. Haberle v. Troxell, 885 F.3d 170, 176 (3d Cir. 2018). But the officers here did more than knock and talk. See Canny v. Bentley, 307 F. Supp. 3d 940, 947 (N.D. Iowa 2018) ("[I]nstead of a 'knock and talk,'" officers who "lean[ed] over the threshold and peer[ed] between the gap in the curtain on the front door to observe the occupants inside [the defendant's] home" "executed a 'lurk and spy.'"). Having received no answer at the door, they fanned out to the side windows and used flashlights to look inside the otherwise darkened interior.

---

Amendment "search." Id. at 9, 11–12. This court finds that Jardines's discussion of the scope of the implicit license to approach a home was foundational to the analysis leading to its holding.  Cf. French v. Merrill, 15 F.4th 116, 131 (1st Cir. 2021) ("[T]he officers' behavior was plainly inconsistent with Jardines, which clearly established that an implicit social license sets the boundaries of what acts officers may engage in within the curtilage of the home, absent exigent circumstances.").

This further investigation exceeded that of the permissible knock and talk,[5] as ordinary visitors are not expected standing at side windows, peering inside with flashlights.

As comparable examples of permissible investigation, the government cites United States v. Wahchumwah, 710 F.3d 862 867 (9th Cir. 2013), and Florida v. Riley, 488 U.S. 445 (1989). In those cases, however, the officers' observations were made from lawful vantage points. The officer in Wahchumwah received consent to enter the home before recording its contents with a concealed device, 710 F.3d at 867, and Riley involved naked-eye observations of a private greenhouse from a helicopter 400 feet above, 488 U.S. at 448—in other words, from the public airway.[6] The observations here, by contrast, were made from within a constitutionally protected area, by way of an unlicensed intrusion.

---

[5] "Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." Estate of Smith v. Marasco, 318 F.3d 497, 519 (3d Cir. 2003).

[6] "The Fourth Amendment simply does not require the police traveling in the public airways at [an altitude of 1,000 feet] to obtain a warrant in order to observe what is visible to the naked eye." California v. Ciraolo, 476 U.S. 207, 215 (1986).

The court concludes that the officers' warrantless peering into the windows of Defendant's home using flashlights effected a Fourth Amendment search.

### c.  Was Defendant McGrath subject to an in-home seizure?

McGrath also argues that the officers constructively arrested him inside his home through their door-knocking, announcements, and other conduct. (Doc. 10, at 8).

A seizure takes place when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure … if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." I.N.S. v. Delgado, 466 U.S. 210, 215 (1984).

A warrantless seizure inside the home is presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586 (1980). Here, it is undisputed that the officers did not physically enter McGrath's home. Yet several courts of appeals have recognized that "law enforcement officers may violate Payton without physically entering the home." United States v. Allen, 813 F.3d 76, 81 (2d Cir. 2016) (collecting cases). Others have concluded that there can

be no Payton violation without physical entry into the home. Id. The Third Circuit, for its part, has found an arrest to have taken place from across a home's threshold. See Sharrar v. Felsing, 128 F.3d 810, 819–20 (3d Cir. 1997), *abrogated on other grounds*, Curley v. Klem, 499 F.3d 199, 209–11 (3d Cir. 2007). In Sharrar, the police had probable cause to arrest the plaintiffs for assault.[7] Id. at 819. After police arrived at the plaintiffs' residence, they and an armed SWAT team surrounded the house and ordered the plaintiffs to exit backwards with their hands behind their heads. Id. at 815–16. The court concluded that the plaintiffs had been arrested inside their home: "There was a clear show of force and assertion of authority. No reasonable person would have believed that he was free to remain in the house."[8] Id. at 819. "Therefore, the police were required to have secured an arrest warrant unless there were exigent circumstances." Id. at 820 (citing Payton, 445 U.S. at 590).

---

[7] The plaintiffs in Sharrar sued police officers under 42 U.S.C. §1983 for illegal arrest and unreasonable search and seizure in violation of the Fourth Amendment. 128 F.3d at 817.

[8] The Third Circuit reasoned that these circumstances constituted an in-home arrest under any of three tests. Sharrar, 128 F.3d at 819 (first citing Terry, 392 U.S. 1, 19 n.16; then citing Delgado, 466 U.S. 210, 215; and then citing California v. Hodari D., 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force … or, where that is absent, *submission* to the assertion of authority.")).

Another district court in this circuit has applied <u>Sharrar</u> in less extreme circumstances. <u>See United States v. Bailey</u>, 2015 WL 327198, at *3 (D.V.I. 2015). In <u>Bailey</u>, Homeland Security Investigations agents had probable cause to believe that the defendant had participated in the illegal mailing of a firearm. <u>Id.</u> at *3 n.7. While executing a controlled delivery of the illegal package to the defendant's home, two agents approached the front door with firearms held in the "low ready" position. <u>Id.</u> at *2. They saw the defendant through the home's open front door, ordered him to come out, and arrested him on his porch. <u>Id.</u> The court concluded that "under the circumstances here, when the two agents approached the residence with guns drawn and ordered Bailey out of the house, they displayed a show of authority and threat of force such that a reasonable person would not have believed he was free to remain in the house." <u>Id.</u> at *3. "Thus, Bailey was constructively arrested inside his home." <u>Id.</u>

McGrath asserts that the combination of the officers' door-knocking, statements, announcements, and other conduct communicated to him that he was not free to remain in his home. (Doc. 10, at 8). According to McGrath, he "did not have a choice" but to exit his home. (Id. at 9).

The government observes that no officer physically entered McGrath's home. (Doc. 16, at 9). Even assuming constructive entry is a viable theory,

the government argues, "there was no hyper-aggressive show of force here." (Doc. 16, at 11).

In the circumstances presented here, a reasonable person would not have believed that he was free to remain in the home. A team of officers stood on McGrath's porch, continually asserting their authority by identifying themselves and commanding him to exit. The armed officers threatened force as they warned that if McGrath did not come out, things were going to get worse, and the dog could get hurt.  They also stated that they would go in if McGrath did not come out. Their message was that McGrath would be arrested either way, but the consequences would be worse, and force might be involved, if he remained inside. So although the officers never entered his home, they left McGrath with only one reasonable choice: to walk out the front door and submit to arrest. He was therefore constructively arrested inside his home.   This arrest is therefore presumptively unreasonable. Payton, 445 U.S. at 586.

### d. Was the officers' search and seizure justified by exigent circumstances?

Because the officers had no warrant, their conduct was unconstitutional unless an exception to the warrant requirement applies. See King, 563 U.S. at 459.  The government contends that the search and seizure

were justified by exigent circumstances: namely, hot pursuit of a fleeing felon and the risk that McGrath might flee again. (Doc. 16, at 12–16)

A warrant is not required where "'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." King, 563 U.S. at 460 (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978)).

### i.   Hot pursuit

Hot pursuit of a fleeing felon may justify a warrantless search or arrest in the home. Welsh v. Wisconsin, 466 U.S. 740, 750 (1984). For this exception to apply, the pursuit must be "immediate or continuous," Id. at 753, but it need not be "an extended hue and cry in and about the public streets." Dorkoski v. Pemsyl, 2007 WL 775602, at *7 (M.D. Pa. 2007) (quoting U.S. v. Santana, 427 U.S. 38, 42–43 (1976)). Nor is it necessary that the suspect be kept physically in view at all times. Id. (citing U.S. v. Miller, 449 F.2d 974 (D.C. Cir. 1970); People v. Escudero, 592 P.2d 312 (Cal. 1979)).

Welsh involved a car driven erratically, off the road, and into an open field. 466 U.S. at 742. After being alerted of the incident, police arrived and spoke to the witness, who told them that the driver had walked away. Id. The officers checked the car's registration, and, learning that the registered owner lived nearby, went to the house without securing a warrant. Id. at 742–

43. The Court concluded that the hot pursuit exception did not apply because "there was no immediate or continuous pursuit of the [suspect] from the scene of the crime." Id. at 753.

In Dorkoski, 2007 WL 775602 at *3–4, a man suspected of assault fled officers in a high-speed chase. He then stopped near his home, exited his vehicle and charged at a pursuing officer. After a struggle, he broke free from the officer and ran. Id. at *5. Although he lost sight of the suspect, the officer knew he must have gone through the yard, and believed he had entered the garage. Id. Backup officers arrived and found the defendant in the garage. Id.  The court rejected an argument that the suspect's "retreat into a private residence" negated the hot pursuit exception, and concluded that there had been "an immediate, fairly continuous pursuit of" the suspect. Id. at *8.

The Third Circuit has not defined the boundaries of the hot pursuit exception, but decisions from other courts offer guidance.  There was no pursuit in U.S. v. Johnson, 256 F.3d 895, 907–08 (9th Cir. 2001), for example, because the officer chasing the suspect lost sight of him and waited 30 minutes for backup to arrive before resuming chase, during which time he returned to the suspect's house to retrieve a pepper spray canister. "The half-hour time period, during which the officers received no new information

about where [the suspect] had gone, turned the pursuit from lukewarm to ice cold." Id. at 908.

Police in U.S. v. Anderson, 688 F.3d 339, 344–45 (8th Cir. 2012), by contrast, were justified in entering the defendant's apartment balcony without a warrant because the drug transaction at issue "occurred on a public street," the defendant fled into the apartment upon seeing the police, and "[t]he police immediately pursued [the defendant] into the apartment building." "Further, unlike the officers in Welch, the officers … did not, at any point, give up the pursuit." Id. at 345.

The court concludes that the pursuit here is closer to those in Welsh and Johnson than to those in Dorkoski or Anderson. The pursuing officers stopped their chase to consult with others about a new course of action. Although the intervening time was short, it cannot be said that their pursuit remained immediate or continuous. They no longer knew where Defendant was, and had to restart the pursuit based on the assumption that he would have returned home. As Officer McNair reported: "The pursuit was terminated." (Doc. 9-2 at 1). The court finds that this termination of the vehicle chase and the interval before the officers' arrival at McGrath's home

broke the continuity of their hot pursuit. Therefore, this exception does not justify the officers' search and seizure.

### ii.    Preventing escape

A warrantless entry may also be justified by the need to "prevent a suspect's escape." Lange v. California, 141 S.Ct. 2011, 2017 (2021). The government argues that the "risk that McGrath might flee again" justified the officers' conduct. (Doc. 16 at 16).

The court finds that this risk did not justify the officer's conduct. While Defendant had committed a dangerous crime by fleeing from the police at high speeds, he no longer had access to his car, for officers were present in his driveway where the car was. And there was no indication that he was armed or otherwise dangerous to the public, such that warrantless entry was necessary. The court therefore concludes that the exigent circumstances exception does not apply, and so the officers' search and seizure was unconstitutional in violation of the Fourth Amendment.

### e.  Suppression of evidence

The government argues that the evidence obtained as a result of the officers' search and seizure should nevertheless not be suppressed because there would be no deterrence value in suppression. (Doc. 16 at 20). See Herring v. U.S., 555 U.S. 135, 141 (2009) ("[T]he exclusionary rule is not an

individual right and applies only where it results in appreciable deterrence …. In addition, the benefits of deterrence must outweigh the costs.").

The government relies on Herring, in which the defendant had been arrested based on an erroneously reported arrest warrant. Id. at 137–38. Relying on the "good-faith exception to the exclusionary rule," the Court concluded that the arresting officers' conduct "was not so objectively culpable as to require exclusion." Id. at 146.

The officers here knew that they had no warrant, unlike those in Herring.  Neither did they rely on a subsequently invalidated warrant, U.S. v. Leon, 468 U.S. 897, 918 (1984) or binding appellate precedent, Davis v. U.S., 564 U.S. 229, 240 (2011). Although the officers may have thought that certain exceptions to the warrant requirement applied, they did not purport to do so on the basis of some authority. Unlike in those cases in which police rely in good faith on authority ostensibly permitting their conduct, application of the exclusionary rule here would serve its purpose by deterring unconstitutional behavior. The deterrence value here is especially strong because McGrath was in his home, where Fourth Amendment protection is strongest. See Kyllo v. U.S., 533 U.S. 27, 31 ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). In this context, the

benefits of deterring unconstitutional intrusion outweigh the substantial costs of suppression. For these reasons, the court concludes that the officers' unreasonable search and seizure here triggers the exclusionary rule. The evidence obtained as a result of this search and seizure must therefore be suppressed.

The next question, then, is which evidence to suppress. McGrath does not specify what evidence he is targeting; he argues generally that "the Court should suppress all primary and derivative evidence tainted by the government's illegal conduct." (Doc. 10 at 11).

After he was arrested, McGrath made confessions to the officers, and underwent a field sobriety test and portable breath test. (Doc. 9-2 at 2). He was then transported to a police station and a blood alcohol content test was administered. (Id.).

"[T]he scope of the exclusionary rule is determined by 'whether, granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." U.S. v. Burton, 288 F.3d 91, 99 (quoting Wong Sun v. U.S., 371 U.S. 471, 488 (1963)).

The officers here obtained the evidence described above because they arrested McGrath. Prior to the officers' continued assertion of authority, McGrath was not volunteering this information. Only when he had been arrested did McGrath confess and submit to the sobriety tests. The court concludes that this evidence came about by exploitation of the illegal seizure, and therefore must be suppressed.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for lack of jurisdiction, (Doc. 6), will be **DENIED**, and Defendant's motion to suppress evidence, (Doc. 8), will be **GRANTED** as to Defendant's statements to the police after arrest and the results of the sobriety, breath, and blood alcohol content tests administered after arrest. An appropriate order will follow.

*S/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 2, 2023**
23-84-01

- 28 -